UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
SECURITIES AND EXCHANGE COMMISSION,    :
                 Plaintiff,            :      11 Civ. 4904 (DLC)
                                       :
         -v-                           :      OPINION & ORDER
                                       :
COMPANIA INTERNACIONAL FINANCIERA      :
S.A., COUDREE CAPITAL GESTION S.A.,    :
CHARTWELL ASSET MANAGEMENT SERVICES,   :
                 Defendants.           :
                                       :
-------------------------------------- X

APPEARANCES:

For plaintiff:
David Stoelting
U.S. Securities and Exchange Commission
Three World Financial Center
New York, NY 10281

Rua M. Kelly
Michael Foster
Michelle Giard Draeger
Silvestre A. Fontes
William J. Donahue
U.S. Securities and Exchange Commission
33 Arch Street, 23rd Floor
Boston, MA 02110

For defendant Chartwell Asset Management Services:
Marc Laurence Greenwald
Kyle R. Taylor
Quinn Emanuel Urquhart Oliver & Hedges LLP
51 Madison Avenue
New York, NY 10010


DENISE COTE, District Judge:

     The Securities and Exchange Commission ("SEC") has moved

for a preliminary injunction against Chartwell Asset Management

Services ("Chartwell") in connection with Chartwell's purchase in the United Kingdom of contracts for difference ("CFDs") for the shares of Arch Chemicals ("Arch"), a United States company whose shares are traded on the New York Stock Exchange ("NYSE"). For the following reasons, the motion is granted to the extent that an asset freeze is entered against Chartwell and Chartwell is preliminarily enjoined from destroying any potentially discoverable material relevant to this action or filing a petition in bankruptcy without leave from the Court.

The SEC filed this action on July 15, 2011 against Chartwell and two co-defendants, Compania Internacional Financiera S.A. ("CIF") and Coudree Capital Gestion S.A. ("Coudree").  On that same day, the SEC obtained an ex parte temporary restraining order, an order freezing assets and an order for other equitable relief against all three defendants (the "July 15 Order").  On July 22, CIF and Coudree consented to an order modifying the July 15 Order with an order providing that CIF and Coudree deposit a bond with the Court and setting an expedited discovery schedule.

Oral argument on the motion for a preliminary injunction as to Chartwell was held on July 28.  The SEC and Chartwell each offered exhibits.  The parties agreed to offer the entirety of the testimony of Vincent de Canniere ("de Canniere"), the owner and managing director of Chartwell, whose deposition was taken

by telephone on July 25.  The following constitutes the Court's
findings of fact and conclusions of law.

BACKGROUND

I.   Lonza's Acquisition of Arch

Arch is based in Norwalk, Connecticut and organized under
the laws of the Commonwealth of Virginia.  It is an
international biocides company that manufactures and sells,
inter alia, water treatment chemicals and hair and skin
products.  Arch has more than $1 billion in annual sales.  Its
common stock is traded on the NYSE.

Lonza Group Ltd. ("Lonza") is a specialty chemicals and
biotechnology company based in Switzerland.  Representatives of
Arch and Lonza began discussing a strategic transaction in June
2010.  In March 2011, the chief executive officers of the two
companies discussed for the first time the possibility of Lonza
taking a significant stake in Arch's equity.  In April 2011,
Lonza's board of directors instructed management to pursue a
possible acquisition of Arch.  On May 2, the two companies
entered into a confidentiality agreement to facilitate the
exchange of information.  On June 30, Lonza's board of directors
approved the broad terms of a proposed merger.

On Friday, July 1, Lonza approached Swiss representatives
of "Credit Suisse" and "Citi" to ask whether the banks would be
interested in participating in arranging the financing required

for the acquisition.

On July 11, before the Swiss stock exchange opened, Arch and Lonza announced that Lonza was offering to acquire all of Arch's common stock for $47.20 per share, and that Arch's board of directors recommended the acceptance of the $1.4 billion cash tender offer.  This represented a premium of roughly 12% above Arch's price at the close of trading on Friday, July 8.  Arch's share price promptly rose to close at $47.37.

The July 11 announcement was the first publicly available information concerning the acquisition.  There had been no other significant news about Arch in the public domain for months. The only press reports to which Chartwell has directed the Court's attention are earnings reports and analysts' discussions of earnings reports, forecasts, and recommendations.  The most recent such press reports were a May 4, 2011 analyst forecast and a June 13, 2011 buy recommendation reported by an internet news service.

II.  Trading Patterns in Arch Stock

The trading in Arch stock during the week before the July 11 announcement -- that is, July 5 through 8 -- reflects a pattern of trading on inside information about the Lonza acquisition of Arch.  During the month before July 5, Arch stock never closed as high as $35.  The trading volume during the week that preceded July 5 -- June 27 to July 1 -- never exceeded

153,000 on any single day.  Chartwell has characterized Arch's trading that week as "relatively flat."  On July 1, the last day of trading before July 5, Arch's stock closed at $34.73, and the trading volume was 152,100.

Between July 5 and 8, Arch stock increased in price 21% to close at $42.17 on July 8.  The trading volume also increased dramatically.  The volume on July 5 was 691,083 shares; on July 6, 935,998 shares; on July 7, 318,970 shares; and on July 8, 1,158,002 shares.

On July 11, the first trading day after the public announcement, the trading volume was over 9 million shares.  The closing price on July 11 was $47.37.

III. Chartwell's Trading in Arch CDFs

Chartwell is a money manager based in Geneva, Switzerland. De Canniere is a Swiss national and the sole owner of Chartwell. De Canniere is also the sole director of Kristen Management Limited ("Kristen"), which is the client that purchased CFDs for Arch through Chartwell.  De Canniere makes the investment decisions for Kristen, but Alshair Fiyaz ("Fiyaz") is the ultimate beneficial owner of the Kristen account.  A customer agreement provides Chartwell power of attorney for Kristen. Kristen's investment history is not part of the evidentiary record, but de Canniere testified that Kristen has taken positions in pharmaceutical companies in the past, although none

5

since February.

There is no evidence that Chartwell had ever purchased Arch securities before July 5, 2011.  De Canniere testified that he spoke with Gabriel Rindone ("Rindone"), a broker at the firm "HMS" in Luxembourg, sometime between July 1 and 3.  During this conversation, Rindone said that there was "hot money" coming into Arch.  De Canniere did not ask any further questions of Rindone about Arch, but contends that he conducted his own research for about an hour after the conversation.  His research included an analysis of the "Bollinger Bands" on the Arch share price, which is an analytical tool to forecast likely future range of a stock's value.  De Canniere has no records of this research and made no notes reflecting the research.  On July 5, de Canniere recommended a purchase of Arch CFDs to Fiyaz.

Between July 5 and 8, Chartwell purchased CFDs equivalent to 425,300 shares of Arch.  A significant portion of the trading in Arch shares each of these days was for the benefit of Chartwell and its two co-defendants, as follows:

| Date | Securities Purchased by Chartwell | Percentage of Total Daily Trading Volume of Arch Securities Purchased by Chartwell | Percentage of Total Daily Trading Volume of Arch Securities Purchased by All Three Defendants |
|---|---|---|---|
| July 5 | 100,000 shares of Arch CFDs | 14.47% | 39.07% |

| | | | |
|---|---|---|---|
| July 6 | 265,000 shares of Arch CFDs | 28.31% | 70.01% |
| July 7 | 35,688 shares of Arch CFDs | 11.19% | 32.19% |
| July 8 | 24,612 shares of Arch CFDs | 2.13% | 7.28% |

There is no evidence that either of Chartwell's co-defendants shared any information with Chartwell or that the two co-defendants coordinated their trading with Chartwell.

De Canniere's first purchase of Arch CFDs for Chartwell took place on July 5 after 4:00 p.m. in London -- as de Canniere put it, "of course after the U.S. [exchange] openings."  During this same period de Canniere also traded in Arch CFDs for his personal account.  On July 6 and 7, he purchased 20,000 shares of Arch CFDs.  On July 8, de Canniere sold 10,000 of those shares.  He testified that he made these sales because, by that time, the price had risen to his target range.  De Canniere also testified that on July 8, he recommended to Fiyaz that Kristen also sell some of its position on that day, but that Fiyaz was not interested in discussing business that Friday afternoon and so postponed his decision until Monday, July 11.  All of these purchases of Arch CFDs were made through ADM Investor Services International ("ADM"), an introducing broker based in London,

and cleared through "Citigroup" in New York.

On July 11, 2011, after the acquisition announcement was made, Chartwell sold all of the CFDs it had purchased and de Canniere sold his remaining CFDs.  These sales were made that afternoon in Geneva, after the NYSE had opened for the day.  At the time of Chartwell's sales, the Arch common stock share price was $46.879.  Chartwell's total profit from the sale on July 11 was $4,651,995.  De Canniere's personal holdings yielded a profit of around $170,000.

IV.  CFDs

CFDs, as explained by the Honorable Robert W. Sweet in Freudenberg v. E*Trade Financial Corp., No. 07 Civ. 8538 (RWS), 2008 WL 2876373 (S.D.N.Y. July 16, 2008), constitute securities as defined by the federal securities laws.  Id. at *6.  "CFD purchasers acquire the future price movement of the underlying company's common stock (positive or negative) without taking formal ownership of the underlying shares."  Id. at *7.  The prices for CFDs are identical to the prices quoted for shares of the company's stock, and in advance of pricing a CFD, the broker purchases matching shares of the stock.  Id.  "Because identical matched transactions occur in shares of the actual common stock immediately before the purchase or sale of the CFDs, any influence on the public market price of the underlying securities is also reflected in the price of the CFDs."  Id.

CFD holders receive the benefit of any dividends paid by the company on the shares and CFD contracts may include voting rights on the shares.  Id.; see also In re Crocs, Inc. Secs. Litig., No. 07 Civ. 2351, 2008 WL 429816, at *4 (D. Colo. Sept. 17, 2008).  As de Canniere explained in the litigation before Judge Sweet that is described below, the prices for CFDs are the prices for the common stock that is traded on the American exchange, and any profits or damages that holders of CFDs experience are identical to those experienced by the holders of the common stock.  As de Canniere's expert explained to Judge Sweet, one advantage of CFDs is that they allow foreign investors to access "U.S. exchange-traded securities without the need to open a U.S. brokerage account."  Declaration of Thomas L. Hazan at 7, Freudenberg, No. 07 Civ. 8538 (S.D.N.Y. Jan. 7, 2008). [1]

---

[1]    It should also be noted that Chartwell's effort here to avoid application of the federal securities laws by distinguishing the purchase of CFDs from the purchase of common stock contradicts the prior position taken by its related entity (and the entity for whom Chartwell purchased the Arch CFDs), Kristen, as well as Straxton Properties Inc., and their common principal, de Canniere, in the Freudenberg action.  This argument may therefore run afoul of the doctrine of judicial estoppel, which "prevents a party from asserting a factual position . . . clearly inconsistent with a position previously advanced by that party and adopted by . . . the court in some manner."  Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 397 (2d Cir. 2011) (citation omitted).  In appointing Kristen, Javed Fiyaz and Straxton Properties Inc. lead plaintiffs in Freudenberg, Judge Sweet relied on Kristen's argument that it satisfied the typicality requirement of Federal Rule of Civil

V.   Kristen Contacts with the United States

     In support of Kristen's application to be appointed lead plaintiff in the <u>Freudenberg</u> securities class action that was filed before Judge Sweet in 2007, de Canniere represented that he would have no difficulty overseeing and participating in the litigation and that he was "prepared to travel to the United States" and otherwise make himself available to prosecute the federal securities law claims brought in that action.  The application was made on behalf of Kristen, Straxton Properties Inc. (of which de Canniere was also the sole director), and Javed Fiyaz.  The application explained that the two companies were investment companies organized under the laws of the British Virgin Islands, had common ownership and that de Canniere was the sole manager of both companies.  Javed Fiyaz was described as an individual investor who resided in London and who had a long-standing personal and business relationship with de Canniere.


DISCUSSION

     The SEC alleges that the defendants traded Arch securities

_____

Procedure 23 because through its purchase of CFDs it "purchased or otherwise acquired E*Trade securities" -- the securities referenced by those CFDs.  Memorandum of Law of the Kristen-Straxton Group at 14, <u>Freudenberg</u>, No. 07 Civ. 10540 (S.D.N.Y. Dec. 3, 2007).

using insider information in violation of § 10(b) of the
Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("§ 10(b)")
and Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").  In this
motion, the SEC seeks a continuance of the relief granted in the
July 15 Order: (1) a freeze of Chartwell's assets connected to
transactions in Arch securities and a preliminary injunction
enjoining Chartwell from (2) any future violation of § 10(b) or
Rule 10b-5, (3) destroying any potentially discoverable material
relevant to this action, or (4) filing a petition in bankruptcy
without leave from the Court.  Before turning to the merits of
the SEC's application, issues of jurisdiction and the
extraterritorial reach of § 10(b) and Rule 10b-5 must be
addressed.

I.   Subject Matter Jurisdiction

     15 U.S.C. § 78aa provides that

     The district courts of the United States . . . have
     exclusive jurisdiction of violations of [the Exchange
     Act] or the rules and regulations thereunder, and of
     all suits in equity and actions at law brought to
     enforce any liability or duty created by [the Exchange
     Act] or under the rules and regulations thereunder.

In this case, the SEC alleges a violation of § 10(b) and Rule
10b-5.  There is no question, and Chartwell does not contest,
that § 78aa provides this Court with subject matter
jurisdiction.  See Morrison v. Nat'l Aus. Bank Ltd., --- U.S. --
-, 130 S. Ct. 2869, 2877 (2010).

11

II.  Personal Jurisdiction

The Exchange Act permits the exercise of personal jurisdiction "to the limit of the Due Process Clause of the Fifth Amendment."  S.E.C. v. Unifund SAL, 910 F.2d 1028, 1033 (2d Cir. 1990).  "[U]nder the Fifth Amendment the court can consider the defendant's contacts throughout the United States." Chew v. Dietrich, 143 F.3d 24, 28 n.4 (2d Cir. 1998).  "The due process test for personal jurisdiction has two related components: the 'minimum contacts inquiry' and the 'reasonableness' inquiry."  Metro. Life Ins. Co. v. RobertsonCeco Corp., 84 F.3d 560, 567 (2d Cir. 1996).  Applying these tests to a statute that permits jurisdiction to be exercised over an entity based on its contacts throughout the United States, a court must first determine whether the defendant has "sufficient contacts" with the United States to justify the court's exercise of personal jurisdiction.  Id.  If such contacts are found, the court may assert personal jurisdiction so long as "it is reasonable [to do so] under the circumstances of the particular case."  Id. at 568.  A defendant satisfies the minimum contacts requirement when his conduct and connection with the United States are such that "he should reasonably anticipate being haled into court there."  Unifund SAL, 910 F.2d at 1033 (citation omitted).

The Supreme Court, in recently revisiting the question of

12

personal jurisdiction over non-resident defendants, has emphasized that "it is the defendant's actions, not his expectations, that empower a [forum's] courts to subject him to judgment." J. McIntyre Machinery, Ltd. v. Nicastro, --- U.S. ---, 131 S. Ct. 2780, 2789 (2011).  Therefore, "the principal inquiry . . . is whether the defendant's activities manifest an intention to submit to the power of a sovereign." Id. at 2788. In other words, it is essential in each case that there be some act by which the defendant "purposefully avail[s] itself of the privilege of conducting activities" within the United States, thus "invoking the benefits and protections of its laws." Id. (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).

"[I]n some cases, as with an intentional tort, the defendant might well fall within the [forum's] authority by reason of his attempt to obstruct its laws." Id. at 2787.  This is not a new statement of the law, as the Second Circuit had earlier held that "personal jurisdiction is proper where the defendant took 'intentional, and allegedly tortious, actions expressly aimed at the forum.'" In re Terrorist Attacks on September 11, 2001, 538 F.3d 71, 93 (2d Cir. 2008) (quoting Calder v. Jones, 465 U.S. 783, 789, (1984).  Once a defendant "is alleged to have traded, on the basis of inside information, options of a United States corporation listed exclusively on a United States stock exchange," that defendant has clearly

13

directed activities towards the United States, the location of many of the shareholders of the corporation who would be "adversely affected" by the alleged insider trading.  Unifund SAL, 910 F.2d at 1033.

Here, the SEC alleges that Chartwell traded Arch CFDs on the basis of insider information.  It therefore traded in securities of a United States corporation that are inextricably linked to the purchase or sale of that corporation's common stock on the NYSE.  Purchasers of CFDs specifically target their investments at the U.S. market, as they receive the benefit or loss of any price changes on the domestic exchange, the dividends paid on the underlying shares, and sometimes receive voting rights.  Freudenberg, 2008 WL 2876373 at *7.  Indeed, CFDs provide foreign investors with a way to access American exchange-traded securities without opening U.S. brokerage accounts.  Declaration of Thomas L. Hazan at 7, Freudenberg, No. 07 Civ. 8538.  Furthermore, as in Unifund SAL, Chartwell's alleged insider trading adversely affected shareholders in the United States, especially as its trading represented a significant percentage of the total trading in the days leading up to the acquisition announcement.  Unifund SAL, 910 F.2d at 1033.  This alleged insider trading therefore provides the minimum contacts and reasonableness necessary for personal jurisdiction.

14

Chartwell argues that its trading in Arch CFDs was entirely conducted in London, it did not purposefully direct any conduct toward New York, and that any effect of its trades in the United States was indirect.  But as de Canniere himself testified, he understood that his transactions in CFDs would be matched by trades in domestic securities in the normal course of business. See also Freudenberg, 2008 WL 2876373 at *7.  That economic reality even dictated the timing of his CFD transactions.  Some metaphysical doubt that Chartwell now claims some putative investor might have about whether its broker traded in Arch's common stock does not defeat the fact that Chartwell knew that a broker would simultaneously cover a sale of a CFD with a purchase of the underlying security, because not to do so would, in de Canniere's words, put the broker's portfolio "in a completely mad position."

III. The Reach of the Federal Securities Laws to Regulate
     Chartwell's Transactions

Chartwell argues that Morrison, in which the Supreme Court overturned the Second Circuit's "conduct and effects" test for evaluating the extraterritorial reach of the federal securities laws, exempts its transactions in CFDs from regulation by these laws.  In Morrison, the Supreme Court held that "there is no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially, and we therefore conclude that it does not."

Morrison, 130 S. Ct. at 2883.  "[T]he focus of the Exchange Act is . . . upon purchases and sales of securities in the United States."  Id. at 2884.  Therefore, § 10(b) "reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States."  Id. at 2888.

Chartwell's insider trading is clearly "the use of a manipulative or deceptive device or contrivance . . . in connection with the purchase or sale of a security listed on an American stock exchange."  Id.; see also S.E.C. v. Wyly, No. 10 Civ. 5760 (SAS), 2011 WL 1226381, at *16 (S.D.N.Y. Mar. 31, 2011) (finding that foreign trading of a swap agreement which referenced a domestic security to be purchased or sold by the broker of the swap agreement satisfied the "in connection with" requirement); cf. Elliott Assocs. v. Porsche Automobiles, 759 F. Supp. 2d 469, 475-76 (S.D.N.Y. 2010) (finding that domestic trading of swap agreement referencing a stock listed on a foreign exchange was equivalent to the purchase of the foreign shares of that company for the purposes of the extraterritoriality rule of Morrison and therefore not covered by § 10(b)).  Indeed, Chartwell concedes in its reply brief that it purchased CFDs "in connection with" domestic Arch stock. Therefore, by its plain text, and following the restricted

16

description of the territorial reach of the securities laws as set forth in Morrison, § 10(b) reaches Chartwell's activity in this case.[2]

Chartwell argues that its transactions are nonetheless exempted from regulation because Morrison requires that a defendant enter either "transactions in securities listed on domestic exchanges" or "domestic transactions in other securities" in order to be liable under § 10(b).  This interpretation misreads Morrison, which never states that a defendant must itself trade in securities listed on domestic exchanges or engage in other domestic transactions.  The problem with extending § 10(b) liability to the defendant in Morrison was that the facts of that case "involve[d] no securities listed on a domestic exchange, and all aspects of the purchases complained of by those petitioners who still ha[d] live claims occurred outside the United States."  Morrison, 130 S. Ct. at

---

[2]    Section 929P of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank Act") may demonstrate the Congressional intent for the extraterritorial application of certain provisions of the federal securities laws that the Morrison court found lacking in prior versions of those laws.  It may be that the Dodd-Frank Act was specifically designed to reinstate the Second Circuit's "conduct and effects" test.  See, e.g., Richard W. Painter, The Dodd-Frank Extraterritorial Jurisdiction Provisions Was It Effective, Needed Or Sufficient?, 1 Harvard Bus. L. Rev. 401 (2011).  This question need not be addressed in this Opinion, however, because Chartwell's transactions are subject to the SEC's regulation through § 10(b) even under the scope of § 10(b) liability articulated by Morrison.

2888.  The Supreme Court did not find the fact that the
defendants engaged in conduct abroad dispositive; the issue was
that § 10(b) punishes "only deceptive conduct in connection with
the purchase or sale of any security registered on a national
securities exchange or any security not so registered," and no
such conduct was found in that case.  Id. at 2884 (citation
omitted).  In contrast, the central issue here is insider
trading in the domestic securities of Arch stock listed on the
NYSE.  Even though Chartwell may have engaged in this insider
trading by trading CFDs in London that were tied to transactions
on the NYSE in Arch's domestic securities, this does not negate
the fact that its alleged deceptive conduct involved securities
listed on a domestic exchange.

    Furthermore, Chartwell's interpretation of Morrison would
create a dramatically narrower view of § 10(b) liability, not
only limiting its extraterritorial application, but also
precluding actions against persons who themselves did not trade
in securities.  These would include individuals engaged in a
"manipulative or deceptive device or contrivance", such as
members of elaborate securities fraud schemes, and individuals
who misleadingly made material misstatements or omitted material
facts in connection with securities transactions but who,
themselves, did not trade in those securities.  There is no
reason to find that such a restriction on federal securities

18

laws is required by <u>Morrison</u>.   Indeed, that reading would be
inconsistent with the Supreme Court's expressed intention in
<u>Morrison</u> to adopt a test faithful to the words of the securities
laws and the regulations thereunder.

IV.   Standards for Granting a Preliminary Injunction with SEC as
      Plaintiff

      Having resolved the threshold issues of jurisdiction and
whether § 10(b) covers Chartwell's transactions, this Opinion
now turns to the merits of the SEC's requests for preliminary
relief.   Section 21(d) of the Exchange Act provides, in
pertinent part:

> Whenever it shall appear to the Commission that any
> person is engaged or is about to engage in acts or
> practices constituting a violation of any provisions
> of this chapter [or] the rule or regulations
> thereunder . . . it may in its discretion bring an
> action in the proper district court . . . to enjoin
> such acts or practices, and upon a proper showing a
> permanent or temporary injunction or restraining order
> shall be granted without bond.

15 U.S.C. § 78u(d).   Thus, to grant a preliminary injunction
upon the SEC's request, the Court must find that the SEC has
made a "proper showing" of actions by the defendants that
violate their statutory obligations.   <u>See</u> <u>Unifund SAL</u>, 910 F.2d
at 1035.   Unlike a private litigant, the SEC need not show risk
of irreparable injury to obtain an injunction, nor the
unavailability of remedies at law.   <u>Id.</u> at 1036.

      The "proper showing" required of the SEC is analogous to

the traditional "likelihood of success" standard regularly
applied to private litigants.  See id. at 1037.  The SEC's
burden of proof varies, however, depending upon the nature of
the preliminary relief it seeks.  Therefore,

> a more substantial showing of likelihood of success,
> both as to violation and risk of recurrence [is
> required] whenever the relief sought is more than
> preservation of the status quo.  Like any litigant,
> the Commission [is] obliged to make a more persuasive
> showing of its entitlement to a preliminary injunction
> the more onerous are the burdens of the injunction it
> seeks.

Id. at 1039.  On the other hand, "the degree to which the
Commission must show likelihood of success will be reduced where
the interim relief sought is not especially onerous."  Id. at
1040.

V.   The SEC's Showing of a Likelihood of Success on the Merits

There are two theories of insider trading liability, the
"traditional" theory and the "misappropriation" theory.  "Under
traditional insider trading theory, section 10(b) is violated
when a corporate insider, such as an officer of the corporation,
trades in the securities of his corporation on the basis of
material, non-public information."  United States v. Falcone,
257 F.3d 226, 229 (2d Cir. 2001).

> Under the misappropriation theory, a person violates
> Rule 10b-5 when he misappropriates material nonpublic
> information in breach of a fiduciary duty or similar
> relationship of trust and confidence and uses that
> information in a securities transaction.  In contrast
> to the traditional theory, the misappropriation theory

20

does not require that the buyer or seller of
securities be defrauded.  Focusing on the language
"fraud or deceit upon any person", we have held that
the predicate act of fraud may be perpetrated on the
source of the nonpublic information, even though the
source may be unaffiliated with the buyer or seller of
securities.

Id. at 230 (citation omitted).  When one who has misappropriated

material nonpublic information in breach of a fiduciary duty and

provided that information to another person, that "tippee" is

liable for insider trading if it had knowledge that the tipper's

information was misappropriated through a breach of its duty.

Id. at 232.

As described above, the discovery collected by the SEC so

far reveals a pattern of trading in the context of a tip that is

not just consistent with, but also suggestive of, insider

trading.  During the week of June 27 to July 1, the trading

volume of Arch's stock was relatively flat.  On Friday, July 1,

Lonza approached Swiss investment bankers about financing its

acquisition of Arch.  De Canniere asserts he was told by a

broker on July 1, 2, or 3 that "hot money" was going into Arch.

This tip, in the context of the recent flat trading of Arch

stock and the lack of any recent press about Arch, suggests that

the broker was aware of some material non-public information

that he predicted would soon have an effect on the trading

volume and stock price.  Indeed, the trading volume and stock

price increased dramatically on July 5, the next day the markets

were open in the United States, in comparison to July 1, the day
when Lonza approached Swiss banks to arrange acquisition
financing.  Trading volume increased 454%, and the closing price
moved from $34.73 on July 1 to $47.37 on July 5.

Having never before traded in Arch securities, asking no
further questions of the broker, and without any press reports
suggesting any new reason to purchase Arch, Chartwell bought a
significant number of Arch CDFs on July 5, representing 14.47%
of the total trading volume of Arch common stock that day.  The
amount Chartwell purchased just on that one day was equivalent
to almost two-thirds of the trading volume on the previous
trading day.  Over the next three days, Chartwell continued to
purchase a large number of Arch CDFs representing a large share
of the daily trading volume.  Chartwell's share would have been
even more dominant if Chartwell were not also joined by CIF and
Coudree those days in making significant purchases of Arch
securities.  Chartwell sold all of its Arch CFDs on July 11, the
date of the acquisition announcement, making a profit of more
than $4.6 million.  During the week preceding the announcement,
de Canniere also purchased Arch CFDs for his own account.

Notably, all of Chartwell and de Canniere's transactions
were effectuated through CFDs, which are highly leveraged
instruments allowing a purchaser to put in relatively little
cash in order to acquire the future price movement of the

22

underlying stock.  The margin required in purchasing a CFD may be as little as 15-20 percent.  Therefore, this is a very attractive option for an investor to receive a leverage-amplified profit if it believes that a company's stock price will rise.  On the other hand, because a CFD purchaser is exposed to the negative price movement of the underlying security, a decline in the stock price imposes a loss far in excess of the CFD purchase price, making CFDs risky investment options.

This pattern of trading, and the context provided by the broker's tip and the timing of events, are circumstantial evidence that Chartwell understood that it was in possession of nonpublic material information about Arch and that it traded on that information.  The limited opportunity for discovery in this case has not confirmed de Canniere's description of his conversation with his broker or revealed how the broker might have received such information, and whether the information was provided in breach of a fiduciary duty.  Similarly, in <u>Unifund SAL</u>, the SEC sought preliminary relief against tippees it alleged traded on inside information on the basis of suspicious trading behavior, before it had identified the alleged tipper. <u>Unifund SAL</u>, 910 F.2d at 1029.  As described further below, the <u>Unifund SAL</u> court found that this type of showing was sufficient to justify certain forms of relief, but insufficient to enter

the most onerous forms of relief available to the SEC in such cases.  Id. at 1040-42.  Therefore, the SEC has demonstrated a likelihood of success on the merits of its claim that Chartwell engaged in insider trading in its transactions of Arch CFDs.

Chartwell argues that it is "settled law" that an allegation of suspicious trading activity provides no basis for preliminary injunctive relief.  It cites for this proposition, however, no case that addressed applications for preliminary relief.  Instead, it cites three decisions on summary judgment, one decision on a motion for reconsideration of a summary judgment decision, and one post-trial motion seeking a judgment as a matter of law for sufficiency of the evidence. Furthermore, these district court and First Circuit cases derive the language Chartwell marshals for this contention from dicta in a single opinion from the Northern District of California, S.E.C. v. Truong, 98 F. Supp. 2d 1086 (N.D. Cal. 2000).  Unlike the hypothetical presented in that case, the SEC here does not seek final determination of the merits of its case based on the suspicious trading activity evidence it has collected thus far, but seeks only to extend the temporary relief provided in the July 15 Order.  Therefore, the cases Chartwell cites are inapposite to the procedural posture here and, if they can be considered to provide "settled law" at all, only disprove a straw man argument the SEC has not endeavored to make.

Chartwell also contends that several "innocent" facts negate any suspicion that arises from Chartwell's trading patterns, but to no avail.  For example, although de Canniere sold half of his CFDs on the last trading day prior to the announcement of the acquisition, this may show only that he took advantage of the significant rise in the stock price during the week of July 5 through 8, a rise which the SEC alleges was a result of insider trading by the defendants.  In his deposition, de Canniere also claimed that he advised Fiyaz to sell down a portion of his holdings in Arch CFDs on the Friday prior to the acquisition announcement and that Fiyaz did not agree only because he did not wish to discuss business on a Friday afternoon.  There is no record of this conversation, and Fiyaz has not yet been deposed.  Again, even if confirmed, this advice may reflect nothing more than a prudent recommendation to lock-in a significant profit opportunity from the stock's four-day run-up, while retaining the remaining portion of the position.

Chartwell also cites the fact that de Canniere made his decision to purchase Arch CFDs only after discussing the company with a broker he speaks to regularly, conducting research, and performing a Bollinger Band analysis.  But the flat trading of Arch common stock prior to July 2011, the nature of the broker's tip, de Canniere's decision to refrain from making a probing inquiry of the broker, the fact that the publicly-available

research on Arch was weeks or months old at the time that de Canniere made his investment decision, and the lack of documentation of his research or analysis seriously weaken de Canniere's claimed lack of scienter.

Finally, Chartwell argues that the SEC's showing of suspicious trading behavior relies on the shared nationality between de Canniere, Chartwell, CIF, Coudree, Lonza and the banks approached for the acquisition financing, and is an attempt to allege "guilt by association."  Although the shared Swiss nationality of many of the relevant entities may become relevant as more discovery is taken, it is not necessary for a finding of a likelihood of success on the merits.  Furthermore, as described above, on its own, Chartwell's suspicious trading activity provides an inference of insider trading without any assumption that Chartwell's activities were coordinated with or connected to the trading by CIF or Coudree.

VI.  The Appropriate Relief for the § 10(b) Violation

    A.   Injunction Against Future Violations of § 10(b)

An injunction against future securities violations has "grave consequences," especially for individuals who are regularly involved in the securities industry, because the injunction places them in danger of contempt charges in all future securities transactions.  <u>Unifund SAL</u>, 910 F.2d at 1040. The reputational and economic harm of suffering a preliminary

injunction, especially on charges of fraud, can also be severe.
Therefore, "[a] preliminary injunction enjoining violations of
the securities laws is appropriate if the SEC makes a
substantial showing of likelihood of success as to both a
current violation and the risk of repetition." Cavanagh, 155
F.3d at 132 (emphasis supplied).  In deciding whether such an
injunction is appropriate, a court looks to

> the fact that the defendant has been found liable for
> illegal conduct; the degree of scienter involved;
> whether the infraction is an "isolated occurrence;"
> whether defendant continues to maintain that his past
> conduct was blameless; and whether, because of his
> professional occupation, the defendant might be in a
> position where future violations could be anticipated.

Id. (citation omitted).

Where, as here, "the Commission has not identified the
person or entity alleged to have conveyed inside information to"
a defendant, it is "more difficult . . . to determine whether,
even if the [defendants] obtained inside information, they
traded upon it in breach of a fiduciary duty that they knew or
should have known existed." Unifund SAL, 910 F.2d at 1040.
Bridging this gap with "unusual trading" is not sufficient to
justify the serious consequences of an injunction against future
securities law violations.  Id. at 1040-41.  Furthermore, the
SEC has not presented any evidence that Chartwell has a history
of securities laws violations.  Therefore, the Court declines to
extend the July 15 Order's injunction against future securities

law violations.

    B.    Freeze Order of Chartwell's Assets

In order to obtain an asset freeze, "the SEC must establish only that it is likely to succeed on the merits." <u>S.E.C. v. Cavanagh</u>, 155 F.3d 129, 132 (2d Cir. 1998).  Such "an ancillary remedy may be granted, even in circumstances where the elements required to support a traditional SEC injunction have not been established." <u>Unifund SAL</u>, 910 F.2d at 1041.  Where, as here,

> [t]here is a basis to infer that the [defendants] traded on inside information, and . . . the Commission is endeavoring to prove at trial the requisite element of trading in breach of a fiduciary duty of which the defendants were or should have been aware, the Commission should be able to preserve its opportunity to collect funds that may yet be ordered disgorged.

<u>Id.</u>  A continued asset freeze is appropriate to preserve the status quo pending a determination on the merits because there is a likelihood that the SEC will succeed on the merits in establishing a § 10(b) violation.

Chartwell contends that the evidence is not sufficient to find a likelihood of success to justify an asset freeze, and specifically suggests that the SEC has presented less convincing evidence than it had in <u>Unifund SAL</u>.  In <u>Unifund SAL</u>, the district court had found a "potential connection" between the defendant and the acquirer of the company whose stock was allegedly traded on the basis of insider information by noting similarities in the last name and residence of certain advisors.

Id. at 1032.  This finding was "not strongly probative," but, in combination with potential connections to other relevant entities and a pattern of suspicious trading activity, there was a "strong inference" that [the defendant] had access to material non-public information . . . prior to the time it began to trade."  Id.  Here, the SEC has presented circumstantial evidence creating a similarly strong inference.

Chartwell questions the asset freeze as it is proposed because the funds in those accounts sought to be frozen are the property of Kristen, not Chartwell.  The proposed freeze order, however, freezes "all assets and funds of Chartwell presently held by them, under their direct or indirect control or over which they exercise actual or apparent investment or other authority."  This language includes the ADM account of Kristen through which Chartwell purchased Arch CFDs because Chartwell has actual investment authority over the account as well as control through de Canniere, the sole director of Kristen, and because the Customer Agreement gives Chartwell power of attorney for Kristen.

Chartwell also argues that the asset freeze, as provided in the July 15 Order, is overbroad.  In the Second Circuit, courts evaluate freeze orders against "the goal of compensating investors."  Manor Nursing Ctrs., 458 F.2d at 1106.  A freeze order is appropriate "in an amount sufficient to cover not just

the profits that might have to be disgorged but the civil penalty, equal to three times the profits." Unifund SAL, 910 F.2d at 1041.  Moreover, "such a remedy is especially warranted where it is sought for a limited duration."  Id. at 1041.

The temporary asset freeze order of July 15 did not specify a time limit for the freeze that might be imposed should it be granted in a preliminary injunction hearing, and the SEC has not since proposed one.  Chartwell argues that any freeze should be limited to thirty days, as was the freeze provided in Unifund. Id. at 1043.  This request ignores that the time limit ordered by the Second Circuit in Unifund followed the imposition of an asset freeze for the six months between the district court's order and the Second Circuit's decision.  Because expedited discovery was already ordered in this action and is due to be concluded in January 2012, instituting this asset freeze until resolution of the merits of this matter at trial or through summary judgment practice will not unduly burden Chartwell.  No later than thirty days after a verdict is entered in a trial or a decision is made on any summary judgment motion, the asset freeze will be lifted unless some further application is made.

The July 15 Order also reaches "all assets, funds, or proceeds held in any account through which, directly or indirectly, trades were made . . . in the securities of Arch." Congress has authorized the forfeiture of a civil penalty equal

30

to three times the profits of insider trading, in addition to disgorgement, under Section 21A of the Exchange Act, 15 U.S.C. § 78u-1. Therefore, the Second Circuit has authorized an order freezing both the amount of disgorgement and this civil penalty. Unifund, 910 F.2d at 1041-42. Therefore, the amount of the asset freeze is limited in this case to $18,607,980 -- the amount of profits derived from the sales of the Arch CFDs ($4,651,995) plus a civil penalty of three times that amount ($13,955,985).

Finally, Chartwell objects to the repatriation requirement of the asset freeze because the evidence that the SEC has gathered since the July 15 Order confirms that no assets related to Chartwell's Arch CFD transactions were ever in the United States. But "once the equity jurisdiction of the district court properly has been invoked, the court has the power to order all equitable relief necessary under the circumstances." S.E.C. v. Materia, 745 F.2d 197, 200 (2d Cir. 1984). Therefore, an order to bring assets to the United States is appropriate if needed to make effective an asset freeze and preserve assets for potential future relief. As Chartwell has not presented any evidence that it has funds that would potentially be secured by an asset freeze in this country, it is ordered to transfer funds in the amount specified in this Opinion as subject to the asset freeze to the Court's account or the account of a U.S. financial

institution over which this Court has jurisdiction.

The Court finds that this limited asset freeze will give "the Commission substantial security without unduly burdening the [defendants]." Unifund, 910 F.2d at 1042. For the same reason, the remaining preliminary injunctive relief requested by the SEC, preventing Chartwell from destroying any potentially discoverable material relevant to this action or filing a petition in bankruptcy without leave from the Court, is also granted as it does no more than preserve the status quo, provides the SEC with the opportunity to conduct discovery and does not unduly burden the defendant.

CONCLUSION

The SEC's July 25 motion for a preliminary injunction and asset freeze is granted to the extent that an asset freeze is entered against Chartwell and Chartwell is preliminarily enjoined from destroying any potentially discoverable material relevant to this action or filing a petition in bankruptcy without leave from the Court.

Dated:   New York, New York
         July 29, 2011

                                    DENISE COTE
                          United States District Judge

32